# Exhibit A

**TISSUE PROCUREMENT, PROCESSING AND DISTRIBUTION AGREEMENT**

**THIS AGREEMENT** (the "Agreement") is made and entered into this 27th day of _September, 2018, by and between **PINNACLE TRANSPLANT TECHNOLOGIES, LLC** an Arizona limited liability company, whose principal offices are located at 1125 W. Pinnacle Peak Rd, Phoenix, AZ 85027 ("PTT") and Aelvio, LLC, whose principal offices are located at 200 Cahaba Park Circle, Suite 100, Birmingham, AL 35242, Mississippi Limited Liability Company(Company") (collectively referred to herein as "Parties" or singularly "Party").

**RECITALS**

**WHEREAS**, PTT is experienced in the procurement and processing of certain biological tissues into bioimplants for transplantation; and

**WHEREAS**, Company is experienced in the design, distribution and marketing of certain bioimplants for transplantation; and

**WHEREAS**, PTT and Company, in recognition of the need for and benefits that result from the availability of biological tissues for transplantation, desire to cooperate with each other in the provision of such bioimplants,

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements contained herein, the parties hereto agree as follows:

1.      **Term/Termination.**  This Agreement shall become effective as of September 27, 2018, and shall remain in effect for a period of two (2) years (the "Term").   This Agreement shall automatically renew for successive 1 (1) year periods unless either party provides written notice to the other Party of its intent not to renew at least ninety ( 90) days prior to the end of the then current term.  This Agreement shall be subject to early termination pursuant to Section 12. Additionally, this Agreement may be terminated at any time by either Party for any reason by providing sixty (60) days written notice of termination to the other party.  Company agrees to accept any tissue committed to on PO that is a work in progress of that purchase order

2.      **Compliance with NOTA.**  The Parties hereby acknowledge that the National Organ Transplant Act (42 U.S.C., Section 274e) (the "Act"), prohibits PTT from the acquisition, receipt and transfer of "Human Organs" (which includes bone and tissue") for "valuable consideration." As used in the Act, the term "valuable consideration" does not include reasonable payments associated with, among other things, the transportation, processing, preservation, quality control and storage of Human Organs. Each of the parties acknowledges that the amounts payable pursuant to Section 6 represent reasonable payments to PTT in accordance with the Act.

3.      **Definitions.**    Unless otherwise stated in this Agreement:

      A.      "Tissue" means human allograft tissue; and
      B.      "donor" means a human anatomic tissue donor; and
      C.      "Bioimplants" mean human tissue allograft manufactured by PTT to the

1

specifications provided by Company

4.    **Procurement, Processing and Packaging.**

A.    PTT shall procure Tissue for subsequent processing into Bioimplants in accordance with Company's specifications, attached hereto as Exhibit A, and the policies and procedures set forth in PTT's Standard Operating Procedures ("SOP") manual, which the Company has reviewed and which shall be incorporated herein by reference.

B.    Company shall be solely responsible for setting the specifications for Tissue intended for use as Bioimplants.  Company's specifications shall be in compliance with all applicable state and federal laws, rules and regulations.

C.    PTT may, in its sole discretion, amend or modify its SOP manual and or individual policies related to Tissue processed under this agreement.  To the extent any changes to the PTT SOP manual or policies affect the specifications outlined by Company under this agreement, PTT will give Company a minimum of thirty (30) days written notice prior to implementing the changes.

D.    PTT agrees that it shall be responsible for obtaining legally valid and adequate consents from all Donors of Tissue recovered and adequately completing medical/social histories from all donors of Tissue in accordance with AATB and FDA standards. PTT further agrees that it will screen all donors of Tissue in accordance with AATB and FDA standards.

E.    PTT shall provide Company with a Certificate of Compliance indicating the results of the screening, testing and processing at the time of the delivery to Company of the Bioimplants.  A specimen copy of the Certificate of Compliance to be completed and provided with each shipment is attached hereto as Exhibit B.  PTT will promptly inform Company of any change in information PTT obtains concerning a donor case.

F.    PTT agrees that its activities relating to the medical/social and logistical screening, recovery and processing of Tissue shall be in compliance with current laws, rules, regulations, standards, and interpretations of the American Association of Tissue Banks ("AATB") and the Food and Drug Administration ("FDA").  PTT agrees to use commercially reasonable efforts to comply with any future changes in the laws, rules, regulations, standards and interpretations of the AATB and FDA.

G.    PTT shall package and label the Bioimplants to Company in the manner prescribed by Company in Exhibit C, which the Company represents and warrants will fully comply with all current applicable state and federal laws, rules and regulations and AATB Standards.

5.    **Handling and Acceptance of Orders**

A.    Company shall issue a three (3) month rolling forecast of its production requirements to PTT and shall update the forecast on a monthly basis.  Such update shall be provided to PTT no later than Monday of the third week of the month before the

2

month during which the deliveries are expected, unless otherwise agreed to in writing by PTT, and PTT may, in its sole discretion, reject any forecast(s) that is (are) not provided by such date. Notwithstanding the foregoing, the parties agree that the forecast for the first month of the initial forecast and the first month of all subsequent forecasts shall be fixed and shall be accompanied by a purchase order number issued to PTT by the Company for each fixed month. The initial forecast is agreed to by both Parties and is attached hereto as Exhibit D. Each month, the Company shall provide a purchase order number consistent with the new monthly volume that has entered the fixed period. Upon receipt of a forecast from Company, PTT shall have ten (10) business days to reject all or any portion of the forecast entering the fixed period. In the event PTT fails to provide written notice of rejection within ten (10) business day time period, the forecast shall be deemed accepted. Bioimplants shall be delivered to the Company at the address stated on the Purchase Order. PTT shall maintain lot traceability and appropriate records, including, but not limited to, production records, product testing, quality assurance, informed consent, and donor history to the extent required by law.

B. Company shall notify PTT in writing of acceptance or rejection of Bioimplants within fifteen (15) business days of receipt, rejection shall be limited due to color not being white and/or the Bioimplants not being compliant with the specification provided. If the Company fails to notify PTT by email or in writing of the Company's rejection of Bioimplants within fifteen (15) business days of its receipt of such products, such failure to notify shall be deemed acceptance of such Bioimplants. If the Company rejects such products within the fifteen (15) day period, the Company will arrange, pay for transportation and ship such products to PTT, except for any allograft that does not meet the specifications, as determined, during surgery. If it is discovered during surgery that any allograft proposed for use in the surgery does not, during surgery, meet the specifications, then the Company shall notify PTT and return such allograft to PTT within ten (10) business days of such surgery, and PTT, within a reasonable period of PTT's receipt, shall correct any problem with the allograft and return and/or replace same.

C. PTT agrees that the Company's forecast, as listed in Exhibit A, which shall be updated on a rolling forecast basis. Company has the right to cancel/ not accept orders only if they are not received more than 60 days past the expected delivery date, it being understood that PTT will use commercially reasonable best efforts to comply with the requested delivery dates, but does not guarantee same.

D. The Company shall not distribute any Bioimplants, which have expired. The Company, at its expense, shall cause any Bioimplants which have expired to be destroyed promptly after expiration or to be utilized as research material (if approved by donor/family on Consent Form), but not for human use.

E. The Company shall handle and store Bioimplants prior to distribution in accordance with all applicable state and federal laws, rules and regulations.

F. The Company shall indemnify, release and hold harmless from liability,

3

PTT from any claims or damages arising out of the improper storage of, or tampering with Bioimplants, including but not limited to intentional acts.

G.    Notwithstanding any provision hereof to the contrary, PTT's liability relating to the rejection of any Bioimplants or their failure to meet the specifications or forecasted delivery dates or any other requirements hereunder shall be limited to the purchase price paid to PTT for the Bioimplants.

6.    **Consideration.**

A.    PTT shall invoice Company on the date of shipment of Bioimplants in accordance with the fee schedule attached hereto as Exhibit E.  Company shall pay PTT within thirty (30) days of the date of invoice.  PTT shall assess a two and one-half (2.5%) percent late charge for each month payment is not timely made in accordance with this provision.

B.    Company understands that the amount paid by Company to reimburse PTT for its services may increase up to 5% per year.  PTT agrees to not raise fees for two years from time of signing the agreement. After the 2 year term Alevio has the option to immediately terminate agreement in writing upon a 5% increase if so desired by Alevio.

7.    **Distribution.**

A.    Company shall perform Bioimplant distribution activities strictly in compliance with the American Association of Tissue Banks (AATB) standards, all applicable state and federal laws, rules, and regulations, including those regulations set forth by the United States Food and Drug Administration ("FDA").  Company shall maintain current and in good standing all licenses and certifications required under state and federal law to perform Company's responsibilities under this Agreement. Company shall provide to PTT, no less often than annually, with copies of all its current licenses and certifications required under state and federal law.  At all times during the term of this Agreement, Company shall be registered with the U.S. FDA as a human tissue banking facility and shall provide the Company's current FDA registration number to PTT and additionally shall provide written notice to PTT of any changes to the status of its FDA registration number as soon as practically possible.

B.    Company shall distribute Bioimplants provided by PTT solely within United States, unless express written consent is obtained from PTT.

C.    Company shall maintain detailed records of its storage and distribution of Bioimplants in connection with this Agreement as required by law.  Regardless of the requirements of law, such records shall be maintained by Company for a minimum of ten (10) years beyond the Bioimplants expiration, transplantation, destruction or other authorized use.

E.   During the Term of the Agreement, PTT shall not directly or indirectly call on, take phone calls from, meet, or otherwise solicit business from, any actual distributor or customer of Company or assist others to do so.

8.   **Quality Assurance.**

A.   Each party shall permit the other to inspect their respective facilities and review its staff for the purpose of quality assurance within the guidelines set forth in the AATB and FDA.   Any such inspections shall be performed upon reasonable notice during normal business hours; shall identify the staff that will perform such inspection; maintain as confidential any information or observation made as part of such inspection. Each Party's inspecting staff shall conduct themselves in an appropriate manner and will not unnecessarily interfere with normal business operations. The Party conducting the inspection shall provide a written report of the inspection to the other party within ten (10) business days.

B.   Company and PTT shall provide copies of applicable documentation to the other party as it relates to Tissue distribution records, audit reports, FDA inspection reports, and AATB inspection reports.

C.   Each party shall promptly inform the other of any complaints and/or suspected adverse reactions or outcomes related to the Bioimplants as soon as practically possible.

9.   **Warranty, Limitation of Liability.**   PTT warrants only that the Bioimplants substantially comply with the Specifications attached hereto as Exhibit A and as set forth in written materials, which may be provided from time to time by PTT prior to or concurrently with the shipment of the Bioimplants to Company. This warranty is intended solely for the benefit of Company and all claims hereunder shall be made solely by and for the benefit Company.  There shall be no third party beneficiaries of any rights or claims that the Company may have from time to time in connection with this Agreement. PTT specifically and absolutely disclaims any and all claims made by Company's customers due to Company's acts or omissions as it relates to Tissue, including, but not limited to, any claims relating to the any representations by the Company concerning performance, quality and/or effectiveness.  Additionally, Company shall indemnify and hold PTT harmless against all claims made by Company's customers when caused by an act or omission by Company.   Company shall have no authority to make any representations or warranties on behalf of PTT concerning the Bioimplants, and any representations made by Company to customers shall be strictly limited to those set forth in the written materials provided by PTT to Company pursuant to the terms and conditions of this Agreement.   Except as expressly provided in this Agreement, PTT shall have no other responsibility or liability with respect to the Bioimplants, or the use thereof, or any services supplied hereunder, and in no event shall PTT be liable to Company or to any Company Customer or third party for incidental, special or consequential damages.   The rights of indemnification provided by PTT to Company hereunder shall be subject to the limitations of

this paragraph.

10.    **Insurance and Indemnification.**

A.    Subject to the limitations set forth in Section 9 of this Agreement, each party hereto ("Indemnitor") agrees to indemnify and hold harmless, the other party (the "Indemnitee") and its officers, directors, and employees, from any claims, demands or legal proceeding (including without limitation the costs, expenses, and reasonable attorney's fees incurred in connection with the defense of any such matter) which may be made or brought against the Indemnitee by any third party by reason of or arising out of the Indemnitor's breach of the duties and obligations as contained in the terms and conditions of this Agreement to be performed by it, or the Indemnitor's negligence, willful misconduct, intentional act, or fraud, it being understood that PTT's obligations are only to deliver Bioimplants that substantially meet the Company's Specifications, and PTT does not warrant their performance.

B.    Both parties shall maintain a separate policy or policies of insurance in the amount of no less than $1 million per occurrence and no less than $3 million in the aggregate for insuring against liability which may be imposed arising out of PTT's acts or omissions, which shall include:  1) comprehensive general liability providing coverage for personal injury, bodily injury, property damage; and 2) professional liability. In addition, Company shall maintain the same limits for Product Liability insurance.  These insurance certificates are available at request by either party.

C.    Company shall indemnify and hold harmless PTT and its officers, directors and employees from any liability, claim, demand, cost, expense or injury arising from any claim that the Bioimplants as contemplated by this Agreement infringe the patent, trademark or copyright rights or any other intellectual property rights of any third party, including but not limited to the legal fees and costs in bringing an action in a court of law or equity, an arbitration so long as it does not conflict with the terms and obligations of this Agreement, and reasonable attorneys fees.

11.    **Confidentiality.**  While this Agreement is in effect, and for a period of two (2) years after the termination of the Agreement, neither the Company or PTT, their affiliates directors, shareholders, officers, employees, agents, or assigns of the foregoing (collectively, the "Affiliates") shall divulge to anyone any Confidential Information (as hereinafter defined), except:  (i) as required in the course of performing the obligations hereunder, (ii) to attorneys, accountants and other advisors, (iii) with the express written consent of the Company or PTT or (iv) as required by law.  The term "Confidential Information" shall mean any information relating to the Company or PTT or their business which is, (1) disclosed to the other (or to the other's Affiliates) during the negotiation of and performance of this Agreement and/or (2) is marked "Confidential" if provided in writing, or if delivered verbally, is reduced to writing within thirty (30) days and marked "Confidential." "Confidential Information" shall be deemed to include the information and findings of the inspections and activities described in Section 8 above.  Confidential Information shall not include any information, which (i) becomes public knowledge without breach by the other of this Agreement; (ii) is obtained by the other (or the

6

other's Affiliates) from a person or business entity under circumstances permitting its disclosure to others; (iii) may be demonstrated to have been known at the time of receipt thereof as evidenced by tangible records; or (iv) is required to be disclosed as a result of a judicial order or decree or governmental law or regulation. If a party makes a disclosure of Confidential Information which is permitted by the terms of this Agreement, such party shall be responsible for ensuring that the person to whom it is disclosed maintains the confidentiality of such Confidential Information in accordance with the terms of this Agreement.

12. **Termination.** Either party has the right to terminate this Agreement by written notice to the other party effective immediately upon the receipt of such notice upon the occurrence of any of the following events. Termination under this Section 12 of this Agreement in no way effect the Company's obligation to purchase any forecasted amount of Bioimplants in the fixed forecast quarter.

A. In the event that the other party shall be adjudicated bankrupt or shall petition for or consent to any relief under any bankruptcy, reorganization, receivership, liquidation, compromise, or any moratorium statute, whether now or hereafter in effect, or shall make an assignment for the benefit of its creditors, or shall petition for the appointment of a receiver, liquidator, trustee or custodian is appointed for all or a substantial part of its assets and is not discharged within thirty (30) days after the date of such appointment; or

B. Upon any default in the performance of or breach of this Agreement, its terms, conditions, covenants, obligations, and/or any undertaking of the either Party hereunder, the other Party shall provide written notice thereof to the defaulting or breaching Party, and the Party receiving such notice of default or breach shall have thirty (30) days to remedy such breach or default to the satisfaction of the other Party, failing which the non-breaching Party, within the following thirty (30) days, may terminate this Agreement by written notice.

13. **Independent Contractor.** PTT is an independent contractor and nothing in this Agreement creates the relationship of partnership, joint venture, sales agency or principal and agent, and neither party is the agent of the other, and neither party may hold itself out as such to any other party, and PTT has no power or authority in any way to bind Company contractually. PTT shall be free to manage and control its business as it sees fit without the management, control or assistance of Company, except as otherwise prescribed herein.

14. **Governing Law and Choice of Forum.** This Agreement shall be governed by and construed, in accordance with, the laws of the State of Arizona, without regard to its choice of law provisions. Any action brought in a court of law or equity must be brought in the appropriate State or Federal court in closest proximity to PTT.

15. **Entire Agreement.** This Agreement and attachments contain the entire understanding of the parties with respect to the matters contained herein. In case one or more amendments, modifications or alterations of this Agreement become necessary, the parties shall negotiate in good faith on such amendments, modifications or alterations. This Agreement may

be amended, modified or altered only by an instrument in writing duly executed by both Parties. Sections titles in this Agreement are for convenience of reference only and are not a part of this Agreement.

16. **Force Majeure.** PTT shall not be liable in any manner for the failure or delay of fulfillment of all or part of this Agreement, directly or indirectly, owing to governmental orders or restrictions, war, war-like conditions, revolution, riot, looting, strike, lockout, fire, flood or other external causes or circumstances beyond PTT's control. Time is of the essence of all of Company's obligations under this Agreement. PTT shall not be liable for any default, damages (direct, indirect, foreseeable, unforeseeable, consequential or punitive) or delays in shipment for any cause beyond its reasonable control.

17. **Assignability.** Neither party to this Agreement may assign any rights or obligations under this Agreement to any other entity or person without the advance written consent of the other party.

18. **Severability.** If any one or more of the provisions of this Agreement shall for any reason be held to be illegal or unenforceable, such invalidity or unenforceability shall not affect any other provision of this Agreement or the validity or enforceability of such provision. The unenforceable provision shall be treated as severable and the remaining provisions shall nevertheless continue in full force and effect, giving maximum effect to the intent of the parties in entering this Agreement.

19. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all which together will constitute one and the same instrument. Counterparts submitted by fax or electronically shall have the same force and effect as the original,

20. **Notices.** Any notice or report required or permitted to be given or made under this Agreement by one of the parties hereto the other shall be in writing and shall be deemed to have been sufficiently given for all purposes, and effective as of the date of receipt, if mailed by certified mail return receipt requested, postage prepaid, addressed to such other party at its respective address as follows:

21. **AATB logo.** AATB Logos and marks are proprietary and, as such, may not be used in any way to suggest that the AATB endorses another organization's or firm's products or services. Violations of this Policy will be addressed by the AATB through appropriate means. These may include, but are not limited to: posting of the offending party's identity on the Association's website; adverse effect on the offending party's current or prospective AATB accreditation or certification; and judicial enforcement of AATB's rights under federal, state and local laws against misuse of intellectual property and unfair trade practices. 3

22. **Accredited Institution Logo.** AATB Accredited Institutions are authorized to use the AATB Accredited Institution Logo, including use of this logo in their materials. Use of the AATB Accredited Institution Logo is prohibited on (i) the label of the immediate Container of finished tissue, and (ii) the label of the Package of non-transplant anatomical material.

8

Permission to use the registered AATB Accredited Institution Logo is granted subject to the condition that use of the logo will have a positive impact on tissue donation and transplantation as well as the reputation of AATB and its institutional and individual members. An organization that is not accredited by AATB may not use the AATB Accredited Institution Logo under any circumstance or for any purpose without receiving prior written authorization from AATB. Any such request to use the AATB Accredited Institution Logo must be submitted in writing to the AATB's Executive Office and approved by the Chief Executive Officer. The request must identify the sponsor and describe how the logo will be presented and used. Those seeking permission to use the AATB Accredited Institution Logo must demonstrate a compelling reason that is consistent with the mission of AATB.

If to PTT:

Pinnacle Transplant Technologies, LLC
1125 W Pinnacle Peak Rd
Phoenix, AZ 85027
Attention: Gabriel Hyams

With a copy to:

Hool Coury Law
Biltmore Financial Center
2398 East Camelback Road, Suite 1020 Phoenix, Arizona 85016

If to Company:

_____
_____
_____

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**PINNACLE TRANSPLANT TECHNOLOGIES, LLC**

By: _____
Noah Stromer
Title: COO

Date: 9/28/2018

**Company**

**Alevio, LLC**

By: *Joseph Robbins*
      —406FA11B3BD94AB...
Printed Name: Joseph Robbins
Title : CEO

Date: 9/27/2018 12:13:31 PM CDT

9

Exhibit A
Company Specifications

Exhibit B
Certificate of Conformance

Attached

Exhibit C
Packaging and Labeling Specifications


All allografts are to be individually packaged in tyvek pouches and placed in Companies' boxes/.

Exhibit D
Bioimplant Forecast of Product Demand